Filed 8/5/22 P. v. Berry CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C094109 |
| Plaintiff and Respondent, | (Super. Ct. No. 18F5617) |
| v. | |
| FRANK ALEXANDER BERRY, | |
| Defendant and Appellant. | |

After Anna Coker's charred remains were found in a remote forest location, defendant Frank Alexander Berry was tried and convicted of first degree murder (§ 187, subd. (a)—count 1); arson of property (§ 451, subd. (d)—count 2); arson of a structure or forest land (§ 451, subd. (c)—count 3); and possession of a firearm by a felon. (§ 29800, subd. (a)—count 4.) He was sentenced to an aggregate term of seven years four months, plus 25 years to life.

On appeal, defendant contends (1) the conviction for first degree murder violated his constitutional rights to a jury trial and due process because there was insufficient

evidence of premeditation and deliberation; (2) the prosecutor misstated the law on premeditation and deliberation in closing argument, which undermined the jury's finding of guilt for first degree murder; and (3) the trial court violated due process and the prohibition against excessive fines by imposing fines and fees without first determining defendant's ability to pay under *People v. Dueñas* (2019) 30 Cal.App.5th 1175. Finding no error, we affirm.

BACKGROUND FACTS AND PROCEDURE

A.      *Discovery of the victim's body*

On Wednesday, August 15, 2018, Brandon Tatlow, an engine captain with the United States Forest Service, was responding to reports of a fire in the LaTour area of Lassen National Forest when he encountered defendant standing near a firepit in a cul-de-sac at the end of a service road. Tatlow saw a fire burning in the pit, with flames reaching about five to six feet high, which he attributed to the presence of accelerants or burning of foreign objects. Tatlow watched as defendant repeatedly walked back and forth between the fire and a vehicle (a Nissan Sentra), which was parked nearby with all four doors and its trunk open.

Later that day, fire officials and investigators searched the firepit and found items of personal property, including a curling iron, hair dryer, cell phone, and laptop, as well as a perfume bottle, studded belt, clothing, jewelry, and other items that appeared to belong to a woman.

The next morning, Tatlow and fire captain Devin Magee returned to the area and continued investigating. In a crevice in a rock outcropping, they found the charred remains of Anna Coker. Coker's feet were covered with rocks, and the cracks of the rock had been stuffed with sticks, suggesting the space had been prepared for a fire. Coker's body was significantly burned and there was heavy charring on the rock. A fire investigator opined that the fire was deliberately set within the crevice.

2

The forensic pathologist who performed Coker's autopsy found evidence of multiple blunt force trauma to her head. She had a "subarachnoid hemorrhage" in her brain, a laceration around her right eye, and a broken nose. She also had "a lot" of blood in her airways and lungs, consistent with having a broken nose and "breathing in [her] own blood." All of the injuries were sustained before death. While the blunt head trauma was "not in and of itself definitively lethal," the pathologist opined that the injuries were "potentially" fatal. Based on the injuries, and the location where her body was found, the pathologist concluded the cause of death was "homicidal violence."

B.     *Testimony of Lynn S.*

Lynn S. lived in a rental unit on defendant's property. Lynn testified that defendant came to her home around 10:30 p.m. on August 13, 2018. Defendant was "swaying back and forth," acting "paranoid" and "rambling on really fast." Defendant asked Lynn if she had heard anything about "children being kidnapped up here for child trafficking." He added that "the lady that I'm seeing and talking to, she's involved in that." Defendant said, "I want to bring her down. I want her to stop this. . . . I'm going to go to San Francisco tonight, and I'm going to get a lawyer." Lynn had never seen defendant act that way before.

The next morning, August 14, Lynn saw defendant retrieve a yellow gas can from a storage area on the property. Defendant said to her, "Lynn, the things we talked about, the things that I told you—if anybody comes knocking at the door or asking you questions, you don't know anything—because my life depends on it."

Lynn next saw defendant on Thursday, August 16. She was outside doing yard work when defendant came up to her and said, "Remember . . . what we were talking about the other night? . . . Well, the lady I was seeing, she's been taken care of." Defendant told Lynn he was going to reduce her rent by $100, and reminded her not to talk about the things he had told her.

3

On August 17, Lynn saw defendant and Raymond A. ("Ray") unloading bleach and cleaning products and carrying them into the trailer where defendant resided. She also saw them moving "bags and stuff" from the trailer to the vehicle.

C.      *Testimony of Raymond A.*

Ray testified that defendant stayed at his home from August 16 through August 18. Defendant had asked Ray not to tell anyone he was there. At some point during the stay, defendant told Ray that he had left Coker "up in the hills." Defendant said, "When I left her she was alive and when I came back she was dead." Defendant also told Ray that law enforcement officers had asked about "the fire," and he remarked, "Little did they know, I already knew about the fire." Defendant gave Ray his cell phone and asked Ray to dispose of it. Defendant also asked Ray to take him to the barbershop so that defendant could get some fake moustaches.

D.      *Testimony of Billy I.*

Billy I. testified that in the week preceding defendant's arrest, defendant borrowed his wife's Nissan Sentra on two occasions. The first time, on August 14, defendant arrived on a motorcycle and asked Billy to go with him to Las Vegas. When Billy refused, defendant borrowed the Sentra, keeping it most of the day.

The second time, on August 15, defendant and Billy drove separately to a store in Shingletown, where defendant asked Billy to buy him some bleach, paper towels, and a fly swatter. Defendant then left in the Sentra. When defendant returned many hours later, he was driving a different vehicle. Defendant told Billy that he had almost run into a firetruck and therefore had to leave the Sentra by the side of the road. Defendant took Billy to get the Sentra, and Billy drove it home.

About 60 to 90 minutes later, defendant showed up at Billy's house. Billy's wife, Nicole, testified that defendant was "breathing heavy" and saying things like, "[T]hey're watching me." Defendant told Billy and Nicole that they might want to paint their car or

4

"park it around back." Billy saw defendant remove from the Sentra something that looked like a gas can.

Later that day, defendant admitted to Billy that he had killed Coker. In Billy's words, "[S]he wouldn't quit fighting, so he hit her in the head with a [Jack Daniels] bottle and knocked her unconscious. Took her up in the hills, she came back to, he left her there, and he came back the next day, and she was dead." Billy gave a similar account when interviewed by law enforcement a few days after defendant's arrest.

E.    *Defendant's arrest and the search of his trailer home*

Defendant was arrested on August 18. At the time of his arrest, defendant was wearing a straw hat, glasses, and a fake moustache. He had used a marker to darken his eyebrows. Defendant had a loaded .25-caliber pistol in his pocket. He also had more than one ounce of methamphetamine in his possession.

Investigators searched defendant's trailer home. It smelled strongly of bleach. Investigators found significant quantities of blood droplets and smears—some visible to the naked eye and more detected using a chemical reagent—in locations throughout the trailer. Much of the blood matched Coker's DNA profile.

F.    *Defendant's testimony*

Defendant testified that Coker was a friend whom he had known for approximately two years. Defendant admitted that he was heavily using methamphetamine around the time of Coker's death. Defendant said that Coker would sometimes use methamphetamine with him.

Defendant claimed that on Monday, August 13, Coker was with defendant in his trailer when the two had an altercation. Defendant went to take a shower and, when he returned, his wallet, phone, and car keys were missing. When he turned around to confront Coker, she pointed a pistol at him and threatened to shoot him. Defendant attempted to disarm her, knocking the gun against her face "at least three" times, causing

5

a "little bit" of blood. Defendant continued to struggle with Coker until the gun dropped to the floor, at which point he grabbed it and placed it in a storage area underneath a bed.

When he returned to the living area, defendant told Coker to leave. But Coker said that she could not because someone was after her money and trying to kill her. She mentioned something about an inheritance of "oil stock" and that "they had put mercury in her shoes." Coker then stood, grabbed a Jack Daniels bottle, and attacked defendant. The two struggled, fell to the floor, and Coker's face hit his elbow, causing her nose to bleed.

As Coker wiped blood from her nose, she told defendant that she had "gotten involved with people who were selling drugs, and they had gotten into . . . meth, and then they started stealing cars, and then they were selling heroin, and that they were involved with human trafficking." Defendant believed some of what she was saying, so he offered to take her to a campsite—referring to the cul-de-sac—where she could stay the night. He told her he would return for her the following day. Coker agreed.

Defendant testified that he drove Coker to the cul-de-sac site—a distance approximately 21 miles from his trailer—and left her there for the night with a ground tarp, sleeping bag, blankets, food, water, and a headlamp. He then returned home. Defendant claimed that when he left, aside from a bloody nose, Coker "seemed perfectly fine." He denied that Coker ever was knocked unconscious.

The following day, at approximately 4:30 p.m., defendant returned to the cul-de-sac, but he did not see Coker. He followed a trail of items to the rock crevice, where he found Coker's body. He could see she was dead and he "freaked out." Remembering that his deceased wife had been cremated, he loaded the crevice with branches, leaves, and pinecones, and set it afire, but then had second thoughts and attempted to put out the fire. He subsequently drove to Billy's home, arriving around midnight. At some point that night, he told Billy what happened.

6

Wednesday morning, defendant went to his home and retrieved a gas can. While there, he saw Lynn, and told her, "You know the girl I told you about . . . that she was going to testify, and she was going [to] bring 'em down, well, she's not going to testify anymore. And I'm probably going to need to get a lawyer for myself now and not to talk about anything until I ha[ve] a chance to get a lawyer." Later that day, after buying bleach and paper towels, defendant drove back to the cul-de-sac, where he used the gasoline to burn Coker's personal property in the firepit.

On Thursday, August 16, defendant returned to the cul-de-sac and saw that officers were "investigating something." "Freaking out," he drove back to the trailer and started cleaning it with bleach. But he stopped when he realized it might be helpful to preserve the evidence.

Defendant testified that he felt responsible for Coker's death because he left her at the cul-de-sac and because of what happened at the trailer, but he never intended for her to die. He claimed he did not take Coker home or to the hospital because she did not want him to, and she said she was "fine." Defendant explained he was wearing a disguise at the time of his arrest because he did not want to be arrested before consulting an attorney.

G. *Jury verdict*

The district attorney filed an information charging defendant with first degree murder of Coker (§ 187, subd. (a)—count 1); arson of property (§ 451, subd. (d)—count 2); arson of a structure or forest land (§ 451, subd. (c)—count 3); and possession of a firearm by a felon. (§ 29800, subd. (a)—count 4.)

The jury found defendant guilty as charged on all counts. The total prison term imposed was seven years four months plus 25 years to life. The court ordered defendant to pay various fines, fees, and assessments. Defendant filed a timely notice of appeal.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends his conviction for first degree murder violated his constitutional rights to a jury trial and due process because there was insufficient evidence of premeditation and deliberation. We disagree.

A.    *Standard of review*

A defendant bears a "massive burden" when claiming insufficiency of the evidence because our role on appeal is a limited one. (*People v. Akins* (1997) 56 Cal.App.4th 331, 336.) We neither reweigh the evidence nor reevaluate the credibility of witnesses. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. (*Ibid*.) Our inquiry on appeal is not to ask whether we believe the evidence at trial established guilt beyond a reasonable doubt. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) " 'Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*Ibid*., original italics.) "Reversal . . . is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

B.    *Analysis*

" 'A verdict of premeditated first degree murder requires more than a showing of intent to kill. [Citation.]' " (*People v. Harris* (2008) 43 Cal.4th 1269, 1286.) "[T]he prosecution must prove that the defendant willfully, deliberately and with premeditation, unlawfully killed a human being with malice aforethought." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1172.) An unlawful killing with malice aforethought, but

8

without deliberation and premeditation, is murder in the second degree. (*People v. Anderson* (1968) 70 Cal.2d 15, 26 (*Anderson*); § 189, subd. (b).)

" ' "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' [Citation.] ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' [Citations.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citation.]" (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

In *Anderson, supra*, 70 Cal.2d 15, our Supreme Court identified three categories of evidence typically used to sustain a verdict of first degree premeditated murder: (1) evidence of planning activity prior to the killing; (2) evidence of the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a motive to kill; and (3) evidence that the manner in which the defendant carried out the killing was so particular and exacting that the defendant must have had a preconceived design to take the victim's life. (*Id.* at pp. 26-27.)

Relying heavily on the *Anderson* factors, defendant argues there was insufficient evidence of planning, motive, and a " 'particular and exacting' " manner of killing to support a finding of premeditation and deliberation.

However, the Supreme Court has since made clear that the *Anderson* factors are "simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 59.) "The categories of evidence identified in *Anderson* . . . do not represent an exhaustive list of evidence that could sustain a finding of premeditation and

9

deliberation, and the reviewing court need not accord them any particular weight. [Citations.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1183; accord, *People v. Halvorsen* (2007) 42 Cal.4th 379, 420; *People v. Silva* (2001) 25 Cal.4th 345, 368.)

Considering the totality of the evidence in this case, we conclude there was substantial evidence to support a finding of premeditation and deliberation. First, there was substantial evidence for the jury to infer that defendant seriously injured Coker when she was in his trailer. The pathologist testified that at the time of her death Coker had a broken nose, a laceration around her right eye, and "a lot" of blood in her airways and lungs. She had suffered repeated blunt force trauma to the head, and there was a "large patch of blood" at the front right part of her brain, consistent with the evidence that defendant had hit her in the head with a Jack Daniels bottle. The pathologist opined that these injuries were sustained before death and were "potentially" fatal.

Second, the evidence showed that after Coker was injured, defendant transported her 21 miles and left her in a desolate location in the forest. Contrary to what defendant argues, this evidence was relevant to defendant's state of mind *prior to the killing* because defendant admitted Coker was alive and conscious after they arrived at the cul-de-sac. Although defendant claimed Coker "seemed perfectly fine" when he left, and that he provided her with food and bedding for the night, the jury was free to disbelieve his testimony and find instead that he made a cold, calculated decision to kill Coker by leaving her, grievously injured and alone, in a remote area of the forest.

The jury could have drawn additional support for this finding from evidence of defendant's conduct after the killing, especially Lynn's testimony that defendant retrieved a gas can from his property the morning after he left Coker in the forest. This evidence supports an inference that defendant knew Coker was going to die when he left her. While *Anderson* warns against using evidence of a defendant's postcrime actions and statements as the *sole support* for upholding a finding of premeditated and deliberate murder, such evidence can lend additional support to a finding that defendant committed

10

a murder for which his specific mental state is established by actions before and during the crime. (*People v. Thompson* (2010) 49 Cal.4th 79, 113; accord, *People v. Whisenhunt* (2008) 44 Cal.4th 174, 202 [evidence of defendant's actions after he inflicted the fatal wounds supported inference of deliberate intent to kill]; *People v. Perez* (1992) 2 Cal.4th 1117, 1128 [conduct after killing inconsistent with state of mind that would have produced a rash, impulsive killing]; *People v. Disa* (2016) 1 Cal.App.5th 654, 667 [same]; cf. *Anderson, supra*, 70 Cal.2d at pp. 32-33.)

The jury also reasonably could have considered that defendant had a motive to kill Coker, either because he believed (even if irrationally) that Coker was involved in human trafficking, or to keep her from reporting the beating he had given her in the trailer.

Case authority establishes that premeditation and deliberation may be inferred where the defendant gravely wounds the victim and then actively prevents the victim from obtaining necessary medical help. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081-1082 [finding sufficient evidence of premeditation and deliberation where defendant shot the victim and then took steps to prevent summoning medical care]; see *People v. Whisenhunt, supra*, 44 Cal.4th at p. 202 [evidence that defendant gravely injured child victim and then dissuaded victim's mother from calling 911 supported finding of premeditation and deliberation]; *People v. Lopez* (2018) 5 Cal.5th 339, 355-356 [escalating acts of abuse and conscious efforts to prevent victim from receiving medical attention supported finding of premeditation and deliberation].) That is the case here.

Viewing the evidence in this case in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that the killing of Coker was deliberate and premeditated. Our conclusion on this point also disposes of defendant's claim that the conviction violated his constitutional rights to a jury trial and due process under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. (*People v. Osband* (1996) 13 Cal.4th 622, 690.)

11

II

*Prosecutorial Misconduct*

In an argument related to his sufficiency of the evidence claim, defendant contends the prosecutor misstated the law and misled the jury by suggesting that an intent to kill was sufficient to establish first degree murder.  Contrary to what defendant asserts in his appellate briefs, this is a prosecutorial misconduct claim, and we review it as such.[1]

The Attorney General contends that defendant forfeited any claim of prosecutorial misconduct by failing to object below.  We agree.  " ' "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." ' [Citation.]" (*People v. Wright* (2021) 12 Cal.5th 419, 444.)  In this case, defendant did not object to any of the prosecutor's alleged misstatements of law.  Nor has defendant shown that an admonition would have been futile.  Thus, any claim that the prosecutor misstated the law was forfeited.

But even if the issue was properly before us, we would not find any reasonable likelihood that the jury understood or applied the prosecutor's statements in an improper or erroneous manner, as required to establish such error. (*People v. Centeno* (2014) 60 Cal.4th 659, 667; *People v. Meneses* (2019) 41 Cal.App.5th 63, 70-71, 73.)  Here, the court properly instructed the jury on the need to find premeditation and deliberation pursuant to CALCRIM No. 521.  The court also properly instructed the jury on how to resolve a conflict between an attorney's argument and the court's instructions with

---

[1]  Defendant contends that he raised the prosecutor's misstatements as a reason why we should not "defer" to the jury's implied findings when reviewing the sufficiency of the evidence.  However, defendant cites no authority, and we are aware of none, purporting to alter the standard of review for sufficiency of the evidence based on a prosecutor's misstatements of law.  Thus, we review the propriety of the prosecutor's statements as a prosecutorial misconduct claim.

CALCRIM No. 200: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Jurors are presumed to follow the court's instructions. (*People v. Johnson* (2022) 12 Cal.5th 544, 632.)

In addition, the prosecutor's comments must be considered in the context of the whole argument. (*People v. Meneses, supra*, 41 Cal.App.5th at p. 70; *People v. Ramirez* (2021) 10 Cal.5th 983, 1005.) Even if some of the prosecutor's statements could be construed as suggesting intent to kill was sufficient for first degree murder, both the prosecutor and defense counsel expressly told the jury that first degree murder requires a finding of premeditation and deliberation.

Moreover, to the extent there was any confusion about the issue, the court's supplemental instructions cured it. During deliberations, the jury sent a note asking for a better understanding of first and second degree murder. The court responded as follows: "Murder of the First Degree is the intentional killing of a human being with express malice aforethought with premeditation and deliberation. For definition of the terms *express malice*, *premeditation* and *deliberation*, please refer to the definitions of those terms in CALCRIM instructions 520 and 521. [¶] Murder of the Second Degree is the intentional killing of a human being with either express malice aforethought or implied malice. Murder of the second degree does not require premeditation and deliberation. Again, for definitions of the terms express malice and implied malice please refer to the definitions for those terms in CALCR[I]M instruction 521." (Original italics.) Defendant concedes this was a correct statement of the law. Where, as here, argument runs contrary to the instructions given a jury, "we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Osband, supra*, 13 Cal.4th at p. 717.)

In the context of the whole argument and the jury instructions, it was not reasonably likely the jury was misled by the prosecutor's comments. Thus, we reject any claim of prosecutorial misconduct.

## III

### *Fees and Fines*

At sentencing, the court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)), a $10,000 suspended parole restitution revocation restitution fine (§ 1202.45), a $40 per count court operations assessment (§ 1465.8), and a $30 per count criminal conviction assessment. (Gov. Code, § 70373.) Defendant did not object to the fees and fines imposed.

Relying on *People v. Dueñas, supra*, 30 Cal.App.5th 1175, defendant asserts the trial court violated due process and the prohibition against excessive fines by ordering him to pay the fines and fees without first assessing his ability to pay. The Attorney General responds that the claim is forfeited and, in any event, lacks merit. We agree that the claims were forfeited.

"In general, a defendant who fails to object to the imposition of fines, fees, and assessments at sentencing forfeits the right to challenge those fines, fees, and assessments on appeal. [Citations.]" (*People v. Greeley* (2021) 70 Cal.App.5th 609, 624, review den. Jan. 5, 2022, S272033.) Defendant was sentenced on May 3, 2021, more than two years after the publication of *Dueñas*. There is no reason why defendant could not have requested an ability to pay hearing based on *Dueñas*. By failing to do so, defendant forfeited the issue on appeal. (*People v. Curry* (2021) 62 Cal.App.5th 314, 328, fn. 7, review granted July 14, 2021, S267394; *Greeley, supra*, at p. 624; see also *People v. Nelson* (2011) 51 Cal.4th 198, 227 [defendant forfeited challenge to maximum restitution fine under section 1202.4 by failing to object at sentencing].)

14

## DISPOSITION

The judgment is affirmed.

                                          _____KRAUSE_____, J.

We concur:

_____ROBIE_____, Acting P. J.

_____DUARTE_____, J.

15